# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| GARY S. STASER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No.  1:05-1106-T |
| | ) | |
| UNITED OF OMAHA LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

---

## ORDER GRANTING DEFENDANT'S MOTION TO DENY RELIEF AND TO AFFIRM ITS DECISION TO DENY BENEFITS

---

On March 9, 2005, Plaintiff Gary S. Staser ("Mr. Staser" or "Plaintiff") sued

Defendant United of Omaha Life Insurance Company[1] ("United" or "Defendant") in the

General Sessions Court of Gibson County, Tennessee.  The genesis of the complaint was

United's decision that Plaintiff, who had substantiated his short-term disability (STD) claim

from March 29, 2004 through June 16, 2004, was not entitled to STD benefits under the

relevant United group-insurance policy for any day later than June 16, 2004.  In addition to

breach of contract, Plaintiff alleged that United's decision not to pay STD benefits after June

16, 2004 entitled him to a twenty-five percent (25%) penalty for bad-faith failure to pay an

---

[1] Although "Mutual of Omaha Insurance Company" is actually the entity that removed this action from state court, the court subsequently entered an order substituting United as the proper party defendant. [Dkt. # 13]. Accordingly, the court will adhere to that order and will refer to Defendant as "United."

This document entered on the docket sheet in compliance
with Rule 58 and/or 79 (a) FRCP on __11-29-05__

insurance claim under TENN. CODE § 56-7-105 (2005) and to treble damages under the Tennessee Consumer Protection Act of 1977 ("TCPA"), as amended, TENN. CODE § 47-18-109(a)(3) (2005). United removed the action pursuant to 28 U.S.C. § 1441, asserting that Plaintiff's complaint "ar[ose] under the" Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et. seq.*

United moved for an order denying any relief to Plaintiff and affirming United's decision to deny STD benefits past June 16, 2004. Plaintiff has not responded to United's motion. For the following reasons, Plaintiff's state law claims pursuant to TENN. CODE §§ 56-7-105 and 47-18-109 are DISMISSED WITH PREJUDICE, the breach of contract claim is converted into an ERISA claim to recover benefits, and United's Motion to Deny Relief and to Affirm its Decision to Deny Benefits [Dkt. # 11] is GRANTED.

I.

In early 2004, Mr. Staser was employed as a Milk Route Driver for Turner Holdings, L.L.C. ("Turner") in Jackson, Tennessee. [A.R. at 6, 104][2] His essential job duties, according to Turner, were to:

Collect[] money from customers, make[] change if needed, and record[] transactions on customer receipts.

Keep[] stock on truck rotated properly by date.

Report[] all store openings, closings, and name changes.

Record[] sales or delivery information on daily sales or delivery report.

---

[2] Citations to the administrative record that was before United when it made the decision to deny benefits shall appear in this order as "A.R. at __." "STAS-0001," for example, shall be cited as "A.R. at 1."

Listen[] to and receive[] service complaints. Place[] stock on shelves or racks. Rotate[] stock as needed by date.

Collect[] or pick[] up empty cases or rejected or unsold merchandise.

Issue[] or obtain[] customer signature on receipt for pickup or delivery.

Clean[] inside and outside of truck. Plug[] refrigeration unit into outlet on dairy grounds when day is completed.

Perform[] all duties in a safe way. Make[] routine daily safety check of vehicle.

Report[] all vehicle collisions or incidents to supervisor, immediately.

Assist[] with special projects, as necessary.

[A.R. at 48] If necessary, however, Turner would make "reasonable accommodations . . . to enable individuals with disabilities to perform the essential functions." [A.R. at 48]

One of the benefits of Mr. Staser's employment with Turner was the opportunity to participate in an employee benefit plan established by Turner for the purpose of, *inter alia*, providing disability benefits to participating Turner employees. *See* ERISA § 1002(1), (3), (5)–(7); [A.R. at 122, 136, 145] The plan was fully insured pursuant to a group policy (the "Policy") that United issued to Turner. [A.R. at 145] Under the terms of the Policy, United exercised "the discretion and the final authority to construe and interpret the Policy[,] [including,] . . . the authority to decide all questions of eligibility and all questions regarding the amount and payment of any . . . [STD] benefits." Accordingly, United determined when a participant met the Policy's definition of "[d]isabled," which stated that:

**Disabled** mean[s] that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which you are:

(a) *prevented* from performing at least one of the Material Duties of Your

3

Regular Job on a part-time or full-time basis[.]

[A.R. at 122 (emphasis added)]

Mr. Staser began suffering from prostatitis-type symptoms at some point in late 2003. [A.R. at 96] On or about April 14, 2004, Mr. Staser filed an STD claim form with United, alleging an onset date of March 29, 2004. [A.R. at 104] On June 11, 2004, a benefit analyst from United advised Mr. Staser by letter that his claim for benefits had been denied initially but invited Mr. Staser to submit additional information. [A.R. at 83] The letter also informed Mr. Staser of his right to appeal the initial decision, which he did. [A.R. at 83, 73] On July 22, 2004, in the course of handling the appeal, United requested additional medical records from Mr. Staser's treating physician. [A.R. at 73]

On August 5, 2004, United notified Mr. Staser that it would pay STD benefits from March 29, 2004 through June 16, 2004. [A.R. at 62] However, United denied STD benefits for any day after June 16, 2004, noting the lack of support in the record for the treating physician's conclusion that Mr. Staser could not perform the lifting duties of his job as Milk Route Driver after June 16, 2004. [A.R. at 62] Once again, United expressed its willingness to review any medical support that Mr. Staser or his treating physician could provide that indicated the existence of a disability after June 16, 2004. [A.R. at 62] In response, Mr. Staser's treating physician simply faxed copies of all of Mr. Staser's medical records to United, but the physician did not explain his conclusion that Mr. Staser was unable to work after June 16, 2004. After conducting internal and independent reviews of Mr. Staser's

4

records, and in light of Mr. Staser's job duties, United determined that Mr. Staser did not meet the Policy definition of "[d]isabled" after June 16, 2004. [A.R. at 28 (September 27, 2004, Decision Letter)]  This decision formed United's final action with respect to Mr. Staser's claim and is the decision now under judicial review.

When United made its final decision to deny STD benefits after June 16, 2004, the record before it showed the following relevant information: On June 16, 2004, Mr. Staser visited his treating physician, Dr. David G. Burleson ("Dr. Burleson"), six weeks after his most recent appointment. [A.R. at 51–52] The June 16, 2004, visit was the fourth time that Mr. Staser had visited Dr. Burleson for prostatitis treatment.  [A.R. at 51–55]  The brief medical history spanning the date of the first visit until the June 16 visit suggested that Mr. Staser began to improve sometime between the beginning of May and the June 16 visit. [*See* A.R. at 55 (March 3, 2004) ("[T]he patient does have some significant chronic prostatitis currently with him having acute prostatitis a little over a month ago."); A.R. at 54 (March 22, 2004) ("Pt called . . . still having problems."); A.R. at 53 (March 25, 2004) ("Mr. Staser comes in . . . complain[ing] of continuing back pain with his prostatitis. He has got pain going down his legs. . . . No other real complaint urologically speaking. . . . He is to continue on his Levaquin for now as well as my anticystitis and antiprostatitis regimens. No straining or heavy lifting until he is completely better. I will then see him back . . . in a month."); A.R. at 52 (May 5, 2004) ("Mr. Staser . . . . [is] still having some problems although improving. He denies any gross hematuria. No urgency or frequency. He does have some

pain . . . and some discomfort after he lifts or strains any at all or rides in a car for any length of time. . . . No other real complaint urologically speaking. . . . I believe he is improving although continues to have some significant chronic prostatitis. . . . I am going to keep him on Levaquin . . . . He is to continue to follow my antiprostatitis regimen and I will see him back *sooner than a month . . . .*") (emphasis added)]  At the June 16, which was *more* than a month after his last visit, Mr. Staser returned to Dr. Burleson, who noted:

> Mr. Staser comes in today for follow up of his prostatitis.  He is still having a *little bit* of trouble *from time to time*.  No other real complaint urologically speaking.  He has *good days and bad days*.
>
> Physical examination demonstrates well developed, well nourished white male.  Abdomen is soft, nondistended and basically unremarkable.  There is no mass present and no CVA tenderness or flank ecchymosis noted.  GU: Normal circumcised male with normal meatus, urethra, testes, epididymi, perineum and scrotum with prostate showing a 10 gram, mildly tender and boggy gland that is otherwise smooth.
>
> Urine today is clear.
>
> He is to continue to take his Levaquin [*as needed*].  I will then see him back again in *3 months*.  He is to continue to follow my anticystititis and antiprostatitis regimens in the meantime.

[A.R. at 51 (emphases added)]  Dr. Burleson made no mention of any type of lifting or other work-related restrictions at the June 16 visit.  On some date between June 16 and United's August 5 initial decision to deny post-June 16 STD benefits, however, Dr. Burleson mailed a letter to United bearing Dr. Burleson's stamped signature.  [A.R. at 47]  The letter read:

> I am seeing Mr. Staser for chronic prostatitis.  The patient was seen by me as a new patient on 03-03-04.  His last office visit to see me was on 06-16-04.  *In regards to his physical restrictions, Mr. Staser is not to do any straining or heavy lifting until he is completely better.  He is due to see me back in September.  His condition will be determined at that time.*

[A.R. at 47 (emphases added] In United's August 5 letter, United specifically notified Mr. Staser and Dr. Burleson of the reasoning behind United's initial decision to deny post-June 16 STD benefits. Specifically, United noted that:

> [Dr. Burleson's June 16, 2004 notes] failed to support the reason [for the subsequent letter] that [Mr. Staser] would be unable to perform the lifting duties of [his] job [until September]. . . . If there is additional information [Dr. Burleson] has that would further explain or support the lifting restriction, please submit it for our review.

[A.R. at 62] Neither Dr. Burleson nor Mr. Staser submitted any additional explanation for Dr. Burleson's post-June 16 letter stating that Mr. Staser was "not to do any straining or heavy lifting until he is completely better."

While reviewing Mr. Staser's appeal of the August 5 letter, United conducted an internal and an independent review of Mr. Staser's records to determine the specific question of whether STD, as defined by the Policy, would be "supported fr[o]m 6/16/04 to mid Sept. due to [Dr. Burleson's] restrictions[,] [the nature of chronic prostatitis,] and [Mr. Staser's] job duties." [A.R. at 44]. As part of the internal review, a United nurse consultant, Cindie Lacke ("Latke"), first reviewed Mr. Staser's file. [A.R. at 44–45] She noted that Mr. Staser was not on any medications that would prevent or interfere with his ability to safely drive a milk truck, that Mr. Staser was not suffering from any post-surgical complications because no surgery had been performed, and that the June 16 notes simply offered little to support a three-month work restriction. [A.R. at 44–45] After Latke's review, on September 2, she referred the file to a United physician. [A.R. at 40] The physician noted that the length of

treatment had been long even for prostatitis, that "anticystitis and antiprostatitis regimens" usually do not involve lifting restrictions, and that, in any event, three months was a "very long time between [doctor] visits" for a patient under temporary lifting or work restrictions. [A.R. at 40]

Finally, United referred Mr. Staser's file to Reed Review Services, [A.R. at 39], where it was reviewed by Dr. Marcel I. Horowitz ("Dr. Horowitz"), a urologist. [A.R. at 32] Dr. Horowitz reviewed Mr. Staser's claim form, the policy definition of STD, Mr. Staser's job descriptions, Mr. Staser's patient history form from his visits to Dr. Burleson, Dr. Burleson's progress notes, the results of all lab tests that had been performed per Dr. Burleson's request, and Dr. Burleson's letter restricting Mr. Staser from "any straining or heavy lifting until he is completely better." [A.R. at 31, 47] Dr. Horowitz concluded that Mr. Staser was not physically impaired or restricted, that the medical file did not document any physical impairment, that it was not medically appropriate to restrict work activity in a patient with prostatitis, and that, if Mr. Staser had been symptomatic since June 16, Dr. Horowitz would have expected Dr. Burleson to have seen Mr. Staser at least once a month thereafter rather than "in September." [A.R. at 32, 47]   Although Dr. Horowitz acknowledged that "abacterial prostatitis [was] . . . a difficult condition to treat," Dr. Horowitz was not of the medical opinion that straining or lifting could cause injury to a patient with abacterial prostatitis. [A.R. at 32] Dr. Horowitz also noted that the *maximum* amount of time off recommended for patients with abacterial prostatitis was only ten days

8

for all job classifications.  [A.R. at 32]  In short, Dr. Horowitz did not concur with Dr. Burleson's indefinite restriction.

On September 27, 2004, United notified Mr. Staser of its final decision to deny benefits after June 16, 2004.[3]  [A.R. at 28]  On March 2, 2005, Mr. Staser commenced the state court litigation that United subsequently removed to this court.  [Dkt. # 1]  He alleged that United had committed a breach of contract at common law, a bad faith failure to pay an insurance claim in violation of TENN. CODE § 56-7-105, and a willful or knowing unfair or deceptive act in violation of TENN CODE § 47-18-109.  [Dkt. # 1, Ex. A]  Before the court is United's Motion to Deny Relief and to Affirm its Decision to Deny Benefits.  [Dkt. # 11]  Mr. Staser has not responded to United's motion.  In fact, Mr. Staser has not responded to any one of United's pleadings or motions that have been filed in this case since removal.  Nevertheless, before determining whether United's decision satisfies the appropriate standard of review, the court must first determine whether United properly removed this case on the basis that it "ar[ose] under ERISA,[4] and, if so, what effect ERISA has on Mr. Staser's state common law and statutory claims.

_____

[3] Although the September 27 letter refers to the last date of disability as June 17, this appears to be a clerical mistake in light of the numerous other references to June 16 in the record.  In any event, whether June 16 or June 17 was the last date of disability is probably not a significant concern of either party to this case.

[4] "The court must determine whether subject matter jurisdiction exists before making any decision on the merits."  *Ogle v. Church of God*, No. 04-6229, 2005 U.S. App. LEXIS 23666, at *8 (6th Cir. Oct. 31, 2005) (citation omitted).

II.

A.

If this were an ordinary insurance policy dispute, the court would remand the case to state court based on the "well-pleaded complaint rule." Under that doctrine, the plaintiff is the master of his complaint and may avoid removal by drafting the complaint with exclusive reference to state law. *See, e.g., Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). Thus, the pleading by the defendant of a federal defense—even an ultimately valid preemption defense—usually does not create proper removal jurisdiction[5] in federal court over a complaint that mentions only state law. *See, e.g., Husvar v. Rapoport*, No. 01-4254, 2005 U.S. App. LEXIS 21381, at *8–9 (6th Cir. Oct. 3, 2005) (amended opinion recommended for full-text publication). "One [rare] corollary of the well-pleaded complaint rule developed in the case law, however, is that Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Id.* at *9 (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64 (1987)) (internal quotation marks omitted).

One "select group of claims" that, regardless of how they are drafted, necessarily arise under federal law are claims to recover benefits allegedly owed to the plaintiff under the terms of an ERISA employee benefit plan. *See, e.g., Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004); *Metro Life Ins. Co. v. Taylor*, 481 U.S. 58, 61–63 (1987); *Warner v. Ford*

---

[5]*See* 28 U.S.C. § 1441

10

*Motor Co.*, 46 F.3d 531, 534 (6th Cir. 1995). These claims are not only subject to the defense of federal preemption provided by ERISA § 1444(a), *see Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 582 (6th Cir. 2002) (internal citations omitted), but they are completely displaced by the civil enforcement provisions of ERISA § 1132(a) & (f), *see Taylor*, 481 U.S. at 65–67. As a consequence, these claims are "converted" into § 1132(a)(1)(B) actions "to recover benefits due to [the plaintiff] under the terms of [the ERISA] plan." *See Warner*, 46 F.3d at 534 (describing the narrow and extraordinary complete preemption doctrine). Hence, for the purpose of removal jurisdiction, they become actions over "which the district courts of the United States have original jurisdiction founded on a claim or right arising under . . . the laws of the United States." *See* 28 U.S.C. § 1441(b).

Here, the administrative record clearly shows that Mr. Staser is directly challenging United's decision that his last date of entitlement to STD under the "[d]isability" provision of the Policy was June 16, 2004. [*See* A.R. at 28 (Sept. 27, 2004 Final Decision Letter)]. The record further shows that Mr. Staser has fully and unsuccessfully exhausted his administrative remedies with respect to that decision. [A.R. at 28] Congress intended the next legal step for Mr. Staser, if any, to be an action seeking judicial review of United's decision to deny him "benefits [allegedly] due to him under the terms of his plan." ERISA § 1132(a)(1)(B); *Taylor*, 481 U.S. at 65–67. Because that is essentially what Mr. Staser's completely preempted breach of contract claim seeks to accomplish, it was converted into an action arising under ERISA, and it was therefore properly removed from state court.

11

### B.

Mr. Staser also labels United's decision not to pay STD after June 16, 2004, as an instance of "bad faith" failure to pay an insurance claim, *see* TENN. CODE § 56-7-105(a), as well as a willful or knowing violation of the TCPA, *see id.* § 47-18-109(a)(3). United contends that these state law claims are also preempted by ERISA and that they should be dismissed with prejudice. The court agrees.

ERISA preempts "any and all State laws in so far as they may now or hereafter relate to any employee benefit plan." ERISA § 1144(a). A state law cause of action "relates to" an employee benefit plan if it would conflict with the objectives of Congress in enacting the ERISA statute. *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 698 (6th Cir. 2005) (citing *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995)). One of Congress' primary objectives in enacting ERISA was to "avoid conflicting federal and state regulation and to create a nationally uniform administration of employee benefit plans." *Id.* In furtherance of that legislative objective, Congress established the comprehensive enforcement provisions of ERISA § 1132(a), thereby preempting any state law that provides alternative enforcement mechanisms, *id.* (citing *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1468 (4th Cir. 1996)), or that "duplicates, supplements, or supplants the ERISA civil enforcement remedy." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). Finally, even if the alternative or additional state law cause of action could theoretically be labeled a "regulat[ion] of insurance" under

ERISA's explicit savings clause, *see* ERISA § 1144(b)(2)(A), the state cause of action is still preempted if it "provides a separate vehicle to assert a claim for benefits outside of, *or in addition to*, ERISA's remedial scheme." *Aetna Health Inc.*, 542 U.S. at 217–18 (emphasis added).

In this case, Mr. Staser's state law claims alleging bad faith failure to pay an insurance claim and a violation of the TCPA merely supplement his primary claim—that the "terms of his [ERISA] plan" required the payment of STD benefits after June 16, 2004. Congress, however, did not provide a separate civil action for money damages by plan participants in addition to the participant's right to bring a claim to recover the actual benefits due under the terms of the plan. The result of that Congressional choice is that Mr. Staser may not proceed with those additional state law claims for compensatory damages. *See id.* at 214–15; *see also id.* at 222 (Ginsburg, J., concurring) (citing, *inter alia*, *Mertens v. Hewitt Associates*, 508 U.S. 248 (1993)).

Thus, even if the court were to somehow find United's decision to deny benefits "in bad faith," "deceptive," or "unfair," Mr. Staser's monetary recovery would be limited to the amount of benefits owed "under the terms of the plan." *Compare* ERISA § 1132(a)(1)(B) *with* TENN. CODE § 56-7-105(a) (authorizing additional penalty of 25% if denial was in "bad faith") *and* TENN. CODE § 47-18-109(a)(3) (authorizing treble damages for "willful or knowing" violations of the TCPA). Because Mr. Staser's state law claims seek to recover far more than what Congress has authorized in ERISA § 1132(a)(1)(B) for the wrongful

denial of benefits, the court concludes that those claims are in conflict with the choices that Congress made in enacting ERISA. They are therefore preempted under both ERISA's express preemption provision, *see* ERISA § 1144(a), and "ordinary principles of conflict" preemption. *Aetna Health Inc.*, 542 U.S. at 217.

III.

The only remaining task is to determine whether or not United's decision to deny STD benefits post-June 16, 2004 should be affirmed. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The decision will be upheld if the plan administrator offers a "reasoned explanation, based on the evidence, for a particular outcome." *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 506 (6th Cir. 2005) (internal quotation marks and citation omitted), *reh'g en banc denied*, No. 04-1886, 2005 U.S. App. LEXIS 22929, at *1 (6th Cir. Oct. 21, 2005). Although there is an apparent conflict of interest when the plan administrator is also the insurer, the conflict does not change the applicable standard of judicial review but instead becomes a factor to consider in determining whether the administrator/insurer's decision was arbitrary and capricious. *Id.* (citing *Bruch*, 489 U.S. at 115).

Here, the Policy gives United the discretionary authority to interpret the terms of the

14

Policy and to determine eligibility for STD benefits. [A.R. at 112] Also, United has offered a reasoned explanation, based on the record before it when it denied post-June 16 benefits, for its September 27, 2004 decision. First, Dr. Burleson's notes from the June 16 visit did not contain any type of work restriction that would have indicated Mr. Staser was unable to perform any of the material duties of his job as a Milk Route Driver as of June 17, 2004. [A.R. at 51] Furthermore, United had a reasoned explanation for not assuming that Dr. Burleson's reference to "anticystititis and antiprostatitis regimens" meant that Mr. Staser could not perform his job responsibilities for three months, for United's internal review indicated that such regimens typically did not include three-month lifting restrictions. [A.R. at 40]   Second, Mr. Staser was not under any debilitating medications and had not undergone surgery, which might have otherwise substantiated his claim of disability. [A.R. at 44–45] Third, United's internal physicians noted that the length of Mr. Staser's treatment had been long as of June 16 even for a patient with prostatitis. [A.R. at 40]   Fourth, according to United's physicians, most physicians do not place patients under "temporary" lifting restrictions and then wait three months for the next scheduled appointment. [A.R. at 40]

Finally, United's independent review fully supported the denial of post-June 16 benefits. Dr. Horowitz, an independent urologist who reviewed the entire file, opined that it was inappropriate to restrict work activity for more than ten days for a patient with prostatitis and that the sparsity of scheduled appointments over the three month period in

question was not consistent with Dr. Burleson's restrictions. [A.R. at 32] Dr. Horowitz's independent opinion reduces the probability that United's decision was based on a conflict of interest. Also, to the extent that Mr. Staser believes United was bound by Dr. Burleson's opinion, he is mistaken. In the ERISA context, the "treating physician's" opinion is entitled to no special weight. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *Seiser v. UNUM Provident Corp.*, No. 04-1177, 2005 U.S. App. LEXIS 7214, at **10 (6th Cir. April 22, 2005) (contrasting social security disability cases). Thus, United properly relied on Dr. Horowitz's disagreement with Dr. Burleson's opinion.

In short, the only suggestion in the record as of September 27, 2004 that even arguably supported a finding of disability within the Policy definition was Dr. Burleson's undated letter stating that Mr. Staser could not do any "straining or heavy lifting until . . . . September." [A.R. at 47] United's decision not to honor that restriction was not arbitrary and capricious. To the contrary, the record shows that United remained open to a finding of disability after Dr. Burleson made the restriction, explained its initial hesitation to grant benefits, invited the submission of additional information, and conducted internal and independent reviews of Mr. Staser's file to ensure that an appropriate benefits determination was made. [A.R. at 62, 44–45, 40, 31–32] When, after conducting the reviews and finding no additional support for Mr. Staser's claim, United denied benefits after June 16, it acted well within its interpretive and discretionary authority under the plan.

IV.

For the foregoing reasons, Plaintiff's state law claims pursuant to TENN. CODE §§ 56-7-105 and 47-18-109 are DISMISSED WITH PREJUDICE.  Plaintiff's breach of contract claim is converted into an ERISA action to recover benefits under the terms of an employee benefit plan.  United's Motion to Deny Relief and to Affirm its Decision to Deny Benefits [Dkt. # 11] is GRANTED.  The clerk is directed to enter judgment in accordance with this order.

IT IS SO ORDERED.


_____
JAMES D. TODD
UNITED STATES DISTRICT JUDGE

_____23 November 2005_____
DATE

17

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 14 in case 1:05-CV-01106 was distributed by fax, mail, or direct printing on November 29, 2005 to the parties listed.

---

Betty Campbell
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ- Memphis
165 Madison Ave.
Ste. 2000
Memphis, TN 38103

Lee Arorey Harris
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ
165 Madison Ave.
Ste. 2000
Memphis, TN 38103

Gary S. Staser
1109 S. College St.
Trenton, TN 38382

Janice Jones
CIRCUIT COURT, 28TH JUDICIAL DISTRICT
Gibson County Courthouse
Trenton, TN 38382

Honorable James Todd
US DISTRICT COURT